and Federal Aviation Administration. Ms. Brown for the Petitioner, Mr. Schultz for the Respondents. Ms. Brown, good morning. Good morning, Your Honor, and may it please the Court, Amy Brown on behalf of Spirit Airlines. Since its 2010 merger with Continental, United Airlines has operated as monopolist at Newark with a greater level of dominance than any capacity-limited airport. The Department of Justice has recognized the significant competitive concerns raised by the merger and the dominance that United has and required United to cede flight slots at Newark to a low-cost carrier, Southwest. But in 2019, Southwest announced that it was ceasing service to Newark. DOJ and Spirit requested that the FAA reallocate a block of 16 peak authorizations to another low-cost carrier to preserve competition at the airport, but in an effort to solidify its monopoly, United argued that the authorization should be retired. In the decision that's under review here, the FAA sided with United and announced that it would not reallocate Southwest's peak authorizations. Even now, when there is no congestion at airports and no reason to limit authorizations, the FAA has set up a regime that continues to favor United. As recently as last week, the FAA reaffirmed that Spirit is not entitled to priority for peak authorizations in future seasons and that United can effectively block Spirit from obtaining priority by continuing to operate flights during those periods. By failing to take the competitive concerns into account and ignoring comments from expert stakeholders like the DOJ and the Port Authority of New York and New Jersey, the FAA acted arbitrarily and capriciously. We ask the court to grant Spirit's petition for review and vacate the decision. If we conclude that the agency action was not final, do you still have Spirit? I guess it depends on the theory on which you've concluded that there is no final agency action. I said that you can be similar or can be related in a sense. If we conclude that it's not final agency action because it doesn't have binding legal effect, would that mean that you don't have standing? I think not necessarily. Obviously, there's a difference between the practical consequences that a decision can have and a binding legal effect and where a decision has practical consequences but not legal consequences. There can still be an injury and still be standing but not necessarily be a final agency action here. Although here, we think we have both. Let's talk about the finality part if we could. What are the chances that the FAA will take Newark to a level three status if Spirit flies the 16 slots that Southwest used to fly during peak hours? What do you think the chances are that FAA will take Newark to level three? I think it's really difficult to put a percentage on that. I think if the airport is operating at its peak capacity and if the delays continue to be what they are here, then the FAA has indicated that if an airline continues to fly without authorizations at a time when the flights are at or above their peak, then it will be looking to make the transition. That's not an idle threat. This is something that has happened before at Newark Airport in 2008. Before the pandemic, did Newark have the at maximum capacity status that you're talking about? Yes, it did. If I understand you correctly and tell me if I'm wrong, if conditions after the pandemic returned to the conditions before the pandemic and if Spirit started flying the 16 peak slots that Southwest used to fly, then you think it's almost certain that the FAA would take Newark to a level three status? We think that that's what the FAA has indicated that it would do and that's backed up by the language that's in the notices itself and by the language that's in the worldwide slot guidelines indicating that when airlines are operating above capacity and there's not a chance of the voluntary negotiations that the FAA has referred to and voluntary adjustments on their own, that that will lead to the transition to level three. What do I do with this language from National Mining, which is a fairly recent DC Circuit opinion? It says, but while regulated parties may feel pressure to voluntarily conform their behavior because the writing is on the wall about what will be needed to obtain a permit, there is in no order compelling the regulated entity to do anything and therefore no finality. I added the therefore no finality part. Sure, so I think that here the threatened transition to level three is only one part of what makes this a final agency action here and the second part or one of the other parts here that I would point you to is the denial of priority that's happening immediately. So, even now Spirit by not having the authorizations for future seasons is denied priority for scheduling in future seasons today and that is particularly important for planning purposes because the authorizations themselves aren't finalized until very near the time that the scheduling season actually begins. Of course, airline tickets on the other hand are sold sometimes nearly a year in advance and the reason that that's even possible is because the airlines can rely on priority that they've received based on their previous schedule, which guarantees them those authorizations in these future seasons even in the event of a transition to level three. And so Spirit is not being entitled or not being permitted to have that priority even now and so that is I think one of the consequences of this decision even if you're not sure if or when the transition to level three will happen. It's this kind of safe harbor that Spirit is being denied and the Supreme Court has held in cases like the U.S. Army Corps of Engineers versus Hawks from 2016. That kind of a safe harbor or the denial of that safe sufficient legal consequence for a final agency action. Let me ask one more question then I'll get out of your way and out of my colleague's way. During the pandemic, I'm going to guess that Newark is not having as many flights as they used to. If you just started flying a bunch of those 16 peak southwest slots and then later, I guess after the pandemic, the scenario you don't want to have happen happens. Newark gets taken to a level three and it becomes illegal for you to continue to fly those slots. Would you have made money in the meantime or is the amount of money necessary as an initial investment to do those 16 slots greater than what you will be able to make in the period between now and when Newark might get taken to a level three? I think that depends entirely on how long that period is. The investment in the infrastructure and in the gates and all that's required to start these ad hoc flights without the guarantee of future priority is significant. That is what keeps Spirit from operating these flights in circumstances. That is the painful choice between compliance and the risk of prosecution in the future that the court has referred to in CSI aviation as a final agency action. I do think that COVID has altered things and has altered the calculus for Spirit because there is really very limited potential for the return of these flights very soon. Because of that, Spirit has taken the of operating flights, ad hoc temporary flights during times that would previously be considered peak hours. But of course, they're not peak hours now because no one is flying. But the way that the FAA has addressed COVID and the situation is just kind of highlighted the way that it continues to favor the incumbent airlines like United here. The FAA has allowed these incumbent airlines to maintain their authorizations and the accompanying priority for future seasons, even when they're not actually operating the flights. While the FAA has declined to issue new authorizations to airlines like Spirit who are willing and able to fly, even though they are aware that the flights are nowhere near their operating caps. So even while Spirit is flying now and United isn't, United is maintaining that priority for future seasons and Spirit is not. And last week's notice that there was a notice that was just published in the Federal Register yesterday, it suggests that the FAA is planning to continue that policy at least through December of this year. And then starting in January, the airlines will have to operate to get priority moving forward, but they only have to give notice a month prior. And so if at that point the authorizations will be at their limit again, they can essentially force Spirit out and force Spirit to make that same calculus that we were referring to earlier about whether the economics are worthwhile for it to risk kind of the enforcement and the cancellation of the flights. But it's not just, I don't want to also say it's not just the cancellation of the flights and the cost of the infrastructure and the gate that it stands to lose. If it's forced to cancel flights on a quick timeline, Spirit, because of its limited presence at Newark and its limited ability to obtain authorizations there, is also unable to rebook the passengers that it's booked on those flights. And so it loses out there as well. So I think that's another problem here. I realize that I'm past my time, but I would like to turn to the merits for a moment if I might. Thank you. On arbitrary and capricious review, the agency needed to address the important aspects of the problem and do more than nod to the concerns raised by commenters only to dismiss them, and they failed to do that here. The comments that were raised, as well as the congressional policy favorite competition, required the agency to consider the competitive effects that its decision was going to have here, and it failed to do so. The agency has kind of gestured towards concerns with congestion and the need to study that, but the record is very clear that there's going to be significant competitive consequences here and only a limited effect on congestion. Competition in Newark is just as bad as it was in 2010 and in 2015 when the DOJ negotiated for these slots and when the DOJ sued United to prevent it from gaining additional slots from Delta. Southwest's departure leaves United with 81 percent of the peak afternoon hours, 73 percent of all of Newark's flights. It gives United five additional monopoly routes in addition to the 81 that it already has, and Spirit, if it were allowed to operate during these peak hours, could add flights to four of those monopoly routes, and it means the loss of a million low-cost tickets per year. On the other hand, you have the congestion, and the data in the reduced congestion by 1.2 percent. If the FAA were actually concerned with congestion, the proper thing to do here would be to use the congressionally approved mechanism, and that is the scheduled reduction meeting, which it's done in the past, and use that perhaps to shift the flights from the 2 o'clock p.m. hour, which would reduce congestion by something like 20 percent rather than the 1.2 percent. Brown, you said United went from 81 to 86 monopoly routes when Southwest withdrew? That's correct. And if Spirit were flying Southwest slots, it would compete with United on four? Yes, on four of the five routes. That's what we know. It's four of the five at the quo, but it's neither of those things. It doesn't preserve the status quo for competition, so the FAA had to choose between preserving status quo for competition and preserving its policy that prevented it from or that it would not allocate slots above the limits here, and it had to explain why it favored the latter instead of the former. The DOJ and other experts have long recognized the value of competition, particularly from a low-cost carrier at an airport like Newark with a dominant monopolist, and that was a factor that needed to be taken into account here. I know I'm well over my time. I believe you had an adverse order on June 4. Is that correct? Yes, I think there was an order on June 4. The most recent that we've seen is the Federal Register notice that was just published yesterday. The June 4 was denying your application for some of the slots, correct? I am not positive on that, but I'm sure if that's the date in the record, I'd have to go back and check on that. Do you have an appeal pending from whatever date it was that denied your application? For the slots for the next season, sorry, for summer. We don't have a petition for that at this point, no. Our view is that the petition that's at issue here and the petition for denial of the slots and the denial of the reallocation of Southwest will cover the future seasons as well because we would have priority then, but we have requested those authorizations in future seasons as well. Thank you. All right. Thank you, Ms. Brown. Mr. Schultz. Thank you, Your Honor. May it please the court. Benjamin Schultz on behalf of the Secretary of Transportation and the Administrator of the FAA. The agency action that is being challenged in this case is not a final agency action. It was a notice that the FAA published in fall 2019 telling the airlines how it expected to run the level two schedule facilitation process for the upcoming summer 2020 season. That notice was not final agency action for two different reasons. The first was that it lacked legal effect, and the second was that even if you thought that FAA's approvals of particular routes had legal effect or approvals of particular time periods had legal effect, the notice was not the culmination of even that process because all that the notice did was it told the airlines how it was going to go through its facilitation process, but then it was incumbent on the airlines to submit their proposed schedules and actually go through that process and go through the process of negotiation and facilitation. It was only once that process ended that the airlines would know which schedules were approved and which ones were not. I'd be happy to talk more about the final agency action if the court has questions about it, and I do want to in particular... I do have a question, Bob. The spirit has cited here and relied on our decision in security point and in safe extensions. We could call them bins and lights for short. Sure. In each case, it was because the agency action as to which finality was an issue limited or defeated completely the petitioner's ability to seek advantageous business relationships, to sell the lights, for instance, to airports. So, whatever the nature of the letter there, it had this limiting effect that seems to be quite an... I'm referring to the letter in security point. It seems to have an effect very much like the effect of the notice here, saying you're not going to be able to backfill these slots. Well, respectfully, your honor, there's a couple problems with that, two very significant ones. The first is that in security point, the action in fact had legal effect. What it was is there were binding agreements, and if the agency had modified those agreements, then there would have been a change in the legal relationship. So, when the agency refused to modify those agreements, it was choosing one legal regime over another. There was binding legal effect. That's not the case here. Even if you thought that the FAA's decision-making said something about approvals, those approvals still don't have legal effect. A good way to think about this is another one of these court cases, which is the case that we cite as the Joshi versus NTSB case. That's a case where Joshi asked the NTSB to reconsider something, and the agency refused to reconsider a published report that it had issued, and it's the case that the agency was definitively saying, look, we're not modifying our report. That's going to just be the report, and there's nothing you can do about it, Mr. Joshi, but it was still held to be not final agency action because the underlying report didn't have legal effect, and so that's what's going on here. The FAA's approvals state the FAA's views. It's the FAA saying these are the flights that we think should go forward, but if Spirit wants to go ahead and operate those flights without FAA approval, it is legally free to do so. The other problem, though, with Your Honor's reliance on the security point case is that even if you thought that it was the approval process that had some sort of legal effect, that only is part of the finality inquiry. The other half is whether or not this is the consummation of the agency's decision, and it's very telling. I'm sorry. One of the elements of the notice, I think, is saying that the slots that it approves or has approved will have priority. Well, respectfully, Your Honor, that's actually not what it says. It's saying that if the agency ultimately concludes that it needs to go to level three at some point in the future, it expects that at that indeterminate future point at which it prospectively goes to a level three airport, then at that point it expects that the approved flights would have priority over the unapproved flights. Now, that's a really important thing to understand, because we're not here saying that if at some point in the future the FAA goes to level three and Spirit wants to get a slot and Spirit doesn't get that slot in the level three regime. We're not Spirit can't at that point seek judicial review. A slots regime would have legal effect. What we are saying is that in the level two regime, where all that FAA is doing is this voluntary facilitation process, where it's telling people, okay, these are the flights that we think are good. Those are the flights that we would rather that you didn't fly, because those decisions don't have legal effect and Spirit is still free to fly right now, then it's not yet final agency action. I'm reminded of Clay Whitehead's observation many years ago that the force, the power of the sword of Damocles is not that it falls, but that it hangs. Well, respectfully, Your Honor, this court has just a legion of cases that say that when you look at the finality inquiry, it's not the practical consequences, it's the legal consequences. And that's something that this court has said repeatedly. Indeed, in the Joshi case, everybody conceded that the NTSB's reports had significant practical consequences, but nonetheless, because it was just a report and it didn't have legal consequences, it was held not to be final agency action. That's just one of many cases. There are plenty of cases about agency advice letters. There are cases, for example, I think there's the California case about the EPA, where the EPA had said that something was decided and it reopened it and there was significant doubt as to whether that old decision was going to stand and the states were going to have to do all these changes to their plans. So everybody agreed that there were significant practical consequences, but it was nonetheless held to be not final agency action. I agree, but it isn't, except as you're saying, it's an elusive distinction between practical and legal consequences. In the Safe Extensions case, where the consequence is that company could not sell lights to airports. That sounds like a practical consequence. Well, it's also a legal consequence. The way that it was understood was that it was a legal, the way at least this court said that it understood the legal regime was that it was a legally, a legal bar on those people buying the product. So it was not just that, you know, they felt that there were practical problems. It was that, at least again, as this court understood it, that there was a, it was illegal for them to make those sales. Nobody's saying it's illegal for Spirit to operate these unapproved lights. Yes, it was illegal to make, for them to make that sales or put another way, no sales, no one would buy. Actually, that's what the, what the company or the court said, probably no airport would buy them. Unlawful for the company to sell them, but no airport would buy them. Respectfully, I think that's not how the court understood it in Safe Extensions, at least as I read the opinion, the court understood it, that it was in fact a legal bar. You see, putting your finger on that. But, but even if, if this court has a different reading, I still want to make a distinction that there are some situations where this court has had a slightly different understanding of finality in situations where the regulated party is put to the situation where it might have to face prosecution. That's like, for example, the Ipsen case. That's not even what we have here. If Spirit operates these unapproved flights, it's not like if Spirit thinks that it's okay and then the FAA says, no, actually, we don't like what you're doing, that Spirit faces some sort of fine or civil enforcement action for anything it did in the past. All that happens is something, at most, all that happens is something prospective. FAA would say, wow, there's really a lot of congestion here. So prospectively, we're going to make this change in the legal regime, but everything that you did up until that point, you did it and it's, it's done. There are no fines that we're going to impose on you or anything like that. Let me first take you back. Let's deal with that in a second. Take you back to safe extensions. Okay. The FAA argues that the AC 42F quote, neither imposes a legal obligation upon any person nor creates any legal rights. Close quote. This is absurd. As safe extensions points out, quote, if a manufacturer's equipment does not meet specifications, it cannot be close quote, placed on the list of FAA approved products, airports can buy. The specs effectively prohibits airports from buying light bases that fail the new test. Now you're telling me that as a legal, as opposed to distinction, as opposed to merely practical. That is how I read this court's understanding of the legal regime and safe extensions. I suppose it's legal in the somewhat attenuated sense that they won't be able to enter into contracts or no airport will enter into a purchase contract. At least as recited in the opinion. Because they could lawfully buy the lights. They just couldn't use them. Well, if that's still, I think if your honor wants to make that distinction, it's still a legal effect in the sense that the use would be prohibited here. No one's saying that spirit is. It would be, but it isn't. It would be if right, but they don't have to use them. They can buy them without using them here. It would be you're saying if, if only the FAA got around to, or had approval applications to disapprove your honor here, here it's, I don't, I don't see the, the parallel here because here it's not like if spirit says, okay, we're going to fly this, then it has like an empty airplane. If spirit says we're going to fly this, then they can sell those tickets. People can board those flights. Those flights can take off and they will have obligate contract obligations to refund tickets. If the flights get canceled, I suppose they might impose on themselves those obligations. What do you make of this part of the, the notice carriers are reminded that runway approval must be obtained from the FAA. In addition to any requirement for approval from the airport terminal or other facilities prior to operating flights at the airport. Yes, your honor. That was inarticulately phrased, but the airline, what the FAA was trying to say there was the airlines for the relevant periods need to submit their schedules in advance. And if you look at the very next sentence that follows the sentence that your honor quoted, they make clear that this is indeed a voluntary regime because it's clear that the only thing that happens if an airline flies a time that is not otherwise approved is that there might be such that the FAA says, you know what, we might need to go to a level three in the future. Well, inarticulate phrasing can be fatal sometimes. Well, your honor, I think if you want to look at more evidence of what was going on here, you can also look at the other notices that are in the administrative record. Probably the most important one is when the FAA in 2016 took Newark from its level three to its level two status. And it's important to understand the distinction in level three. If you fly a you face fines, you face civil enforcement actions. But when you go down to level two, the whole point of going to level two was to get rid of that. And the FAA said at the time, we're instead going to go through a process that it expressly team termed a voluntary process. Are you familiar with the chamber of commerce case in this court, an OSHA case? I'm not sure I know which case your honor is referring to. Another instance in which the agency said that taking advantage of the program they were offering was completely voluntary. And the court held that as a practical matter, that was compliance was so was effectively coerced. And that made the order appeal. Your honor, there are some rare cases where courts have, despite the numerous cases in this court saying that you shouldn't account for practical consequences. There are some rare cases where the courts have nonetheless, this court has nonetheless looked to practical consequences. But when it is done, so my understanding has been in very narrow circumstances, where, for example, you might face enforcement action. So for example, the Ipsen case, where if you if you took an action, and then the agency later decided that you were wrong, then you would face enhanced penalties for having done it in the interim. The most that spirit can say here, and I want to point out, by the way, that the things that it's saying about its business costs are things that it's saying here oral argument, it's not pointing to things in the record. This is not an argument that it was even making in its opening brief about finality. But the business costs that it's saying are not anything close to the kinds of things that this court was talking about when it was talking in Ipsen about fines or other kinds of prosecutions. The most that we're talking about is that there's some sort of uncertainty out in the future. And I that they're worried about, that's their regardless, even if they get these approvals, these approvals are only good for a six month scheduling season. There's no legal requirement that when the FAA goes to the winter 2020 scheduling, some season or summer 2021, that it continued existing grandfather policies, the uncertainties there regardless. Historically, the FAA has continued its grandfathering policy. And maybe for the carriers that provides them some of assurance and benefit that they know what the historical tendencies have been. But it's not like if Spirit got these approvals for a six month period, it would be secure for sure that all the uncertainty was gone. So really all that we're talking about here is they're trading kind of one sort of loose situation for maybe kind of another informal security. And again, Your Honor, I realize that we've been talking a lot about the Mr. Schultz, just before we go beyond finality, I just have one question. Well, two, how long does it take to go from level two to level three, if the FDA decides to make that decision? Are we talking weeks, months? I think the answer is unclear. In part, there are different ways that you could go from level two to level three. One way to do it is with a scheduling reduction meeting. That's the way it was done at JFK in 2007. And that took a few months, is my understanding. There were meetings, there were discussions. Ultimately, the process at the end of that was an order that forcibly reduced the flights at the airport and issued a level three regime. Another way to do it is the way that it's been done at LaGuardia, and then the way it's been done, I think, at JFK since that scheduling reduction meeting, which is that the FAA has published a notice in the Federal Register, it's gotten comments from people, and then the comments come back, the FAA responds to those comments, it might make some changes in response to the comments. I think the short answer is, historically, it's been a matter of months, but every situation is Newark is at level two. And Spirit is flying all these flights that they want to fly, because compliance is voluntary. And let's imagine I'm looking to book a flight on an airplane nine months out. And let's imagine I know everything that the five of us now know. Would you buy that airline ticket? Your Honor, I think it depends on a lot of factors. One thing to remember also is that even if you had complete knowledge of an airline's, you know, airline schedules, airline schedules can change for a lot of reasons. Even once airlines get approval within the scheduling facilitation process, things can change even within that process. So even an airline that had, you know, certainty vis-a-vis the FAA, that airline might change its schedules for a whole host of other reasons. So, you know, I think that's just a really hard question to answer without knowing more information. If you were choosing as a purchaser between two airlines that were otherwise identical, but one of them is facing at least the possibility of losing its slots in the manner that Spirit would face at least the possibility of losing its slots, and you were a purchaser choosing between those two otherwise identical airlines, which airline would you buy your ticket from? Your Honor, I think even in that situation, even that other airline, it's not 100% secure either, because there's always the possibility out there that the FAA could go to level three, and that's in fact what happened at JFK in 2007. Delays spiked at the airport, and within a matter of a few months, you know, airlines thought that they could fly in this completely unregulated regime. There were no slot requirements or not even, there were no slot requirements at JFK. I think maybe JFK was level two at the time, so I don't want to say completely unregulated regime, but it certainly wasn't level three, and then because of delays spiking at JFK, the FAA had that scheduling reduction meeting. It culminated in order, and there were fewer flights at the airport, so again, even within this level two construct, even the airlines that have these approvals, even they don't have that level of certainty, so I think if you want to say like is there, maybe Spirit has some indeterminate higher percentage that it might not get approval, that it might not be able to fly some flight in the future, what that difference in percentage is is really hard to say. I certainly haven't seen anything in the record from Spirit establishing that, and of course, you know, that would be their burden as the party that is affirmatively asserting jurisdiction under 46.110, and you know, as to what the percentage difference is and whether that would affect a choice, I think it's just, I don't know the answer to that without more information, and I think in any event, your honor, all that that gets to is practical consequences, which this court has just been really adamant is not the way that you evaluate finality. I may have a question about the merits just briefly. Am I correct in recalling, that the FAA, when it made this decision, projected it would reduce delays by something under two minutes per flight on average? Your honor, that's not correct, and there's different models that are in the record, and depending on which model you use, you might get a slightly different answer. I think if you use, there was data that looked at November 2019 schedules, and that's probably the most comprehensive model in the record. This is a tab in an Excel spreadsheet. It's in the joint appendix, but it's produced in native format. It's a giant Excel file. The court's welcome to go through it if it wants to, but at the end of the day, if you look at the tab called EWR 2019-11-WOSWA2, what that analysis shows is it's around three to four minutes projected per flight in the late afternoon to early evening period, but remember that's per flight over approximately 80 flights per hour, so we're not just talking kind of nothingness here. We're talking real benefit, and then the other thing to keep in mind is that arrivals and departures are not in equipoise. The patterns at a large northeastern airport like Newark would be that you tend to see more arrivals in the morning hours. You tend to see more departures in the evening hours, so that three to four minutes average is actually masking the fact that in the late afternoon evening where you see more arrivals than departures, that you're seeing more benefits on the arrival side, and again, this is, you know, so this is not some insignificant thing. I also want to point out that if you look at Spirit's brief where they try and make these claims about de minimis benefit, and if you actually pull those record sites, they don't support that at all. These are just assertions that Spirit is making, but their record sites don't establish that, so I think I'm looking at the right material here. This is the graphic form. I've also got the tabular form. Yes, hopefully you're looking at tab EWR 2019-11-WOSWA2. I know there's a lot of tabs in that spreadsheet. I believe that that is correct. Okay, great. So, all right, so you're telling us it's three to four minutes on average. For the late afternoon, early evening period, because remember not all of the time periods at this airport were at the scheduling level. Was the lower number that I recalled something that averaged it over all the operations? I don't know where that number comes from. I do know that Spirit has made assertions that are not supported by the record citations in their brief, so perhaps your honor was relying on one of those assertions. Thank you. Before we leave finality, I realize I'm well over my time, but I just want to make sure that I get the other answer to Judge Ginsburg's question about safe extensions, which is that if you think all of what I've been saying about legal effect is wrong, then it's still important to understand that Spirit brought this challenge to an order that was issued before anybody had actually submitted their summer 2020 schedules. And so if Spirit thought that these approvals had legal effect, if they thought that they had all these business consequences, it was incumbent on them to at least wait until the approval process was done, because at that point there would be more clarity about which flights were approved and which flights weren't. And indeed, as we point out to the court, some peak flights that were there were new peak flights that ended up getting approved in the summer 2020 scheduling session, including some that went to ultra low cost carriers. And the fact that Spirit filed this challenge prematurely on an incomplete record, I think just illustrates the lack of finality here. And are the approvals to which you just referred going to be grandfathered? I'm sorry, I think your honor and Judge Walker were talking at the same time, I didn't hear either question. Were the approvals to which you just referred going to be grandfathered? So your honor, when we talk about grandfathering, when there's a prospective session, so if we're talking about summer 2021, if the FAA continues its historical grandfathering policies, then the fact that somebody was approved in summer 2020, if they operate those flights, then they would, under historical policies, get grandfathering in summer 2021. Yes. Thank you. All right, Judge Walker, did you have a question? I'm good. Thank you. All right. All right. Thank you, Mr. Schultz. Thank you. Ms. Brown, I think you're out of time, but why don't you take a couple minutes? I appreciate that, your honor. The June 4th denial that Judge Ginsburg was referencing, that is cited in our reply brief at page 12, and that is consistent with the other notices and the FAA's position throughout this entire proceeding and all proceedings since now that's been consistently reiterated that it's not going to reallocate these authorizations to the extent that they are above the operating caps. The FAA or the government seems to kind of try and walk some of the mandatory language that appears in the notice itself, but it's pretty unequivocal. The notice says that carriers are, quote, ultimately expected to operate according to the FAA's approved runway times. That's one of the notices at JA 225, the worldwide slot guidelines with which the FAA says it complies, uses similarly mandatory language. So, I think that it's a little, the agency is kind of trying to have it both ways here by forecasting or showing those that it's regulating that it intends to hold them to these without creating kind of a final agency action here, especially in Newark's situation when there's not just the authorizations, but the caps on the authorizations and the caps on flights, which is unique to Newark itself. The sort of Damocles that Judge Ginsburg has referenced, that we think has fallen already here. The FAA has given priority for the authorizations to United, and that's a present effect that puts us at a disadvantage today, even if we can fly for a limited time in the interim. The government has said that we didn't cite the economic costs to Spirit in our brief, but that's actually at our reply on pages 9 and 10 where we referenced that the economic considerations made it impossible for Spirit to kind of fly on an at any moment. The government also hasn't denied here that if we keep flying without authorizations and the service returns to the pre-pandemic levels, the FAA would convert to Level 3. And it's also clear from the record, I think, that when you have historic precedents and the priority during Level 2, that does transfer over to Level 3. And so, there is this safe harbor that I referenced before. Sorry, I can see that I'm past my time. If there are no further questions, we would ask the court to vacate the decision and grant our petition here. All right. Thank you. And your case is submitted.
judges: Henderson, Walker, Ginsburg